1   cars that had been following Patrick's car.  RT at 138.  When

2   Masina was running, Pauline was ten to eight feet behind her.  RT

3   at 139.  They were both running fast.  Id.

4        When she got to the Super Fair parking lot, Pauline heard

5   voices talking loud.  RT at 144.  She did not remember what they

6   were saying.  Id.  She saw someone was getting mobbed, jumped.  RT

7   at 145.  She didn't know who it was when she first looked over

8   there, but she thought it was the guy who ran out of Patrick's car.

9   Id.  That person turned out to be Shannon.  Id.  Pauline knew it

10  was Shannon because Masina had said something about Cooley before

11  she got out of the car.  Id.

12       Pauline watched what was going on for a few minutes.  RT at

13  146.  She didn't remember how long.  Id.  She saw cars in the

14  parking lot, but did not remember how many.  Id.  She didn't

15  remember if the cars had their headlights on.  RT at 147.

16       Pauline did not remember how many people were jumping Shannon.

17  RT at 149.  It was more than one or two, but she did not know if it

18  was more than ten or twelve.  Id.  She saw people punching him in

19  the face.  Id.  She saw someone holding Shannon on one side of the

20  arm.  RT at 150.  It was his left side.  Id.  That person was in

21  between Pauline and Shannon while the mobbing was going on.  Id.

22  Pauline identified Tennison as the person who was holding Shannon.

23  RT at 151.

24       Pauline could not remember if Tennison was holding Shannon

25  with one hand or two hands.  Id.  Shannon was doing nothing while

26  Tennison was holding him.  RT at 152.  Pauline did not remember

27  what the other people were doing while Tennison was holding

28                                35

1 Shannon. <u>Id.</u> At some point, Pauline became aware of someone

2 holding a gun. <u>Id.</u> She first became aware of the gun when it was

3 in front of Shannon. <u>Id.</u> It was six or ten feet away from

4 Shannon. RT at 152-53. Pauline did not see where the person with

5 the gun had come from. RT at 153. She did not remember what the

6 other people were doing before the man with the gun came up. <u>Id.</u>

7 Pauline saw someone holding Shannon on the right side, also. RT at

8 154. She didn't know how long Shannon was being held by two

9 people. <u>Id.</u>

10   Pauline did not see or hear the man with the gun do anything

11 with the gun before he shot Shannon. RT at 155. Pauline knew the

12 gun was fired because she heard it. <u>Id.</u> Before the gun was fired,

13 the two people who had been holding Shannon let go of him. <u>Id.</u>

14 Pauline did not know where they went. <u>Id.</u> Pauline did not

15 remember what Shannon did after they let go of him. RT at 156.

16 She did not remember him moving anywhere. <u>Id.</u> She thought the

17 person with the gun shot Shannon because he fell down after the gun

18 was fired. <u>Id.</u> Pauline did not know whether anyone said anything

19 to Shannon or to anyone else before the gun was fired. <u>Id.</u> But,

20 when asked if she heard Masina say anything before the gun was

21 fired, Pauline remembered that Masina said something like, "Don't

22 do it. Leave him alone." RT at 157. Pauline remembered Masina

23 yelling, but she did not remember how many times she yelled. <u>Id.</u>

24 Pauline did not remember how long after Masina yelled that the gun

25 was fired. <u>Id.</u>

26   Pauline remembered the gun was long, but she didn't remember

27 how long. RT at 157-58. Pauline thought it looked more like a

28           36

1 rifle than a hand gun. RT at 158. After she heard the gun go off,
2 Pauline ran to her friend Lerma's house because she was scared. RT
3 at 158-59.

4 Pauline did not remember whether, after she left the parking
5 lot, she saw Masina again that night. RT at 167. Pauline did not
6 remember whether she heard any other shots when she was running
7 from the parking lot. RT at 173.

8 Pauline testified that when she spoke to Hendrix for the first
9 time, she told him that she had been walking around before she saw
10 Shannon get shot because she thought she would be arrested if she
11 told him that she had been in a stolen car. RT at 177. She told
12 Hendrix that she had been with Masina immediately before she saw
13 Shannon being mobbed, and that was true. RT at 178. Pauline was
14 not able to identify the person who had the gun. RT at 184.

15 Pauline acknowledged that, at a prior court hearing, she had
16 testified about the Shannon homicide. RT at 189. She admitted
17 that at that hearing, she had testified that Tennison was not
18 present at the mobbing of Shannon and she had not identified him in
19 the courtroom, even though Butterworth had asked her to identify
20 him and Tennison was in the courtroom. Id. Pauline testified that
21 she didn't identify Tennison because she was scared. RT at 190.
22 At the prior court hearing, Butterworth had put photographs in
23 front of Pauline and asked her to point to the photograph of the
24 person who was involved in the mobbing of Shannon and Pauline had
25 not pointed to Tennison's photograph because she was scared. Id.
26 After that hearing, Pauline moved to Hawaii so that she could be
27 safe. RT at 191.

28

37

Pauline testified that on April 23, 1990, she had told Butterworth that she wasn't at the Super Fair parking lot when Shannon got shot. RT at 192. Pauline testified that she told Butterworth that because she was scared and because she had not wanted to testify any more. Id. Pauline remembered that Hendrix came in to talk to her and she reiterated that she was not at the shooting. RT at 193. Pauline remembered that the day after, Hendrix put her in touch by telephone with Masina who was living in Samoa. Id. While she was talking to Masina, Hendrix was outside the room. RT at 194. Pauline told Masina that she had just told the police she was not present when Shannon was shot. Id. Masina started getting mad and told Pauline she was stupid. Id. Masina told her not to be scared and to tell the truth. RT at 195. Then Pauline went back to Hendrix and told him the truth, that she had been present when Shannon got shot. Id. Pauline did not remember exactly what she had told Hendrix. Id.

### 2. Cross-Examination

Pauline did not remember the type or color of the car that she and Masina were driving in the night of the shooting. RT at 208. She didn't know if it was a two-door or a four-door car. RT at 209. That night was the first time Pauline had ever been in a car with Masina driving. Id. Before the night of Shannon's shooting, Pauline had never seen Masina drive a car. Id. Pauline did not remember whether Masina had a key to start up the stolen car or got it started some other way. RT at 213. Pauline did not remember whether they ran into any other friends that night before they went to Lovers' Lane. RT at 214. She did not remember whether they

38

1 stopped the car anywhere before they went to Lovers' Lane. <u>Id.</u>

2     Masina was Pauline's best friend and they helped each other

3 out when they got into trouble. RT at 217. Masina was good

4 friends with Shannon. RT at 218.

5     Pauline could not tell what kind of cars came into the parking

6 lot at Lovers' Lane because she didn't pay attention to it. RT at

7 225. Pauline did not hear any voices say anything after the cars

8 arrived. RT at 228. She never heard anyone say, "There goes that

9 nigger Pat. He going to pay the price." <u>Id.</u> Pauline never saw a

10 truck at Lovers' Lane. <u>Id.</u>

11     The idea to chase the cars was Masina's, not Pauline's. RT at

12 231. Pauline did not remember how Masina started up the car in the

13 parking lot, whether she used a key or hot-wired it. <u>Id.</u> Masina

14 was driving fast down the hill behind the other cars. RT at 232.

15 Pauline was not scared; she just wanted to see what was going on.

16 <u>Id.</u> At some point, Masina caught up to the other cars while they

17 were going down the hill. <u>Id.</u> Visitacion curves as it goes

18 downhill. <u>Id.</u> As they were going down the hill, Pauline could

19 only see the car they were directly behind, but she did not

20 remember what kind of car it was, although it was not a truck. RT

21 at 233. After Masina caught up with the last car, she kept up with

22 that car through the rest of the chase. <u>Id.</u> Pauline did not see

23 Patrick's car crash because there were cars in front of her. <u>Id.</u>

24 The car had already crashed when she first saw it when they came

25 down the Visitacion hill. RT at 234. Pauline did not see anyone

26 in the crashed car. <u>Id.</u> Pauline saw other cars in the street, but

27 didn't know what kind of cars. <u>Id.</u>

28                         39

1    Pauline testified that when she was watching Shannon get

2 mobbed, she couldn't tell that it was Shannon because there were a

3 lot of people in the way.  RT at 239.  She couldn't see how

4 Tennison was holding Shannon and she didn't know where his hand was

5 because she was looking at him towards his side, but she knew

6 Shannon couldn't just stand there by himself.  RT at 239-40.

7 Pauline was looking toward Tennison's left side.  Id.  Pauline did

8 not see any weapons in anyone's hands other than the gun that shot

9 Shannon.  RT at 242.  Pauline did not remember Tennison hitting or

10 beating Shannon.  RT at 246.  Pauline at one time told Hendrix that

11 Tennison was one of the people who had beaten Shannon.  Id.  Her

12 memory then was better than it was at the trial.  Id.

13    Pauline affirmed that she was testifying that nobody was

14 holding Shannon when he was shot.  RT at 283.

15        3. Re-direct

16    On re-direct, Pauline testified that she couldn't see

17 Tennison's hands, but she knew that Tennison was holding Shannon

18 because Shannon couldn't stand up by himself after he was mobbed or

19 when he was getting mobbed.  RT at 314-15.  Pauline testified that

20 Shannon was trying to get away but he didn't because two boys were

21 holding him.  Id.

22    D. Masina's Testimony

23        1. Direct Examination[8]

24    Masina testified that about 8:00 or 9:00 p.m. on the evening

25 of August 18, 1989, she was driving around in a stolen car.  Pet.'s

26

27 [8]The record submitted by Respondent does not include RT pages
324-408.  Tennison has submitted some of the missing pages.

28                               40

**United States District Court**

For the Northern District of California

Smith began to drive, so she didn't see all of it. <u>Id.</u> at 27. The people were saying, "He's from Sunnydale," but they didn't say a name. <u>Id.</u> at 17. Smith saw the other cars were in the parking lot and people were beating Shannon up. <u>Id.</u> at 26. There were between ten to thirteen people in the parking lot. <u>Id.</u> at 29. Not all of them were beating Shannon. <u>Id.</u> at 29. There were so many people standing there, that she couldn't actually see Shannon, but she knew something was going on. <u>Id.</u> at 29.

Smith saw Ricard walk over to the passenger side of the truck and get a shotgun. <u>Id.</u> at 26, 30, 32. She didn't see the door to the truck open and couldn't see whether he got the gun out of the cab of the truck or the back of the truck. <u>Id.</u> at 30, 32. She didn't see what he was doing in the truck, but when he walked away, he had a shotgun in his hand. <u>Id.</u> at 32. Then everybody moved out of the way, they all backed up. <u>Id.</u> at 32. And then Ricard shot Shannon. <u>Id.</u> at 32. She couldn't see him shoot, because there were too many people around, but she heard the shot. <u>Id.</u> at 32. She only heard one shot. <u>Id.</u> at 33. Smith saw Ricard come back to the pick-up and get into the back of it still carrying the shotgun. <u>Id.</u> at 55-56. Even though Smith didn't actually see Ricard shoot because everything happened so quickly, her impression was that he didn't have time to give the gun to anyone else. <u>Id.</u> at 56. Smith stated that Tennison and Goff were not present. <u>Id.</u> at 59. She said that she did not see any females there and she did not hear any females yelling, "Don't hurt him, don't hurt him." <u>Id.</u> at 71.

Anthony got into the car and Smith took off. <u>Id.</u> at 33. Anthony asked her why she didn't pick up Ricard and she answered

"he's not getting in my car after he just did what he did." Id. at

33. Then Smith drove back to the Hunters' Point area and parked by

the Sundial, a park in Hunters' Point. Id. at 34. The truck and

the other cars also ended up by the Sundial. Id. at 33. She heard

Ricard say to the others "that was one down and it felt good." Id.

at 33. Luther, Anthony and a person she knew named Coog Nut were

among the people at the park who heard Ricard. Id. at 34-35.

Ricard also said that they were going to get ten people from

Sunnydale for the two people that died in Hunters' Point. Id. at

35.

Smith said that Ricard had told Sodapop about the shooting; a

few days later Sodapop told her that he had heard that she was at

the Super Fair parking lot when it happened. Id. at 37. Smith

said she went to Ricard to ask him why he was telling people what

happened and Ricard responded that it felt good to say they killed

his friend, so they had to die. Id. at 38. Smith said that Ricard

had told many people around Oakdale about the shooting and it was

not a secret. Id. She said that many people questioned her about

the shooting, but she told them that she was not there. Id.

Smith stated that she had called Hendrix and Sanders before

the trial with this information, but had told them that she had

heard it from someone else because she didn't want to put herself

"into more trouble." Id. at 42. Sanders came out to her house and

they sat in the parking lot to talk. Id. at 61.[11] Smith had told

---

[11]At this point in the interview, Butterworth was questioning
Smith. After Smith said that she had spoken to Sanders before the
trial, Butterworth indicated that he was confused by her statement.
Id. at 61.

60

1  Sanders that she knew that Ricard was the shooter.  Id. at 61-62.

2  Sanders had asked her if she would come to court and she said she

3  didn't want to come to court.  Id. at 61.  Smith said she told

4  Sanders that she knew who had killed Shannon, but she repeated that

5  the way she put it was that she heard it; she didn't want to say

6  she saw it because then she'd have to go to court.  Id. at 62.  She

7  told Hendrix and Sanders that, after the shooting, she saw the

8  people who were at the shooting and their cars and truck at the

9  Sundial.  Id. at 62.  Then three officers from the Gang Task Force

10 came out to her house to show her pictures of the pick-up truck she

11 had described to Sanders.  Id. at 36, 62.  She identified the pick-

12 up in the photograph they showed her as the truck that was involved

13 in the shooting or as one similar to it.  Id. at 36-37.  She didn't

14 say at that point that she had been at the scene of the shooting.

15 Id. at 63.  After the trial, she called Sanders and told him they

16 had convicted the wrong people.  Id. at 63.

17     Smith stated that after Tennison was convicted, Luther and

18 Ricard told her not to say anything and threatened her.  Id. at 64.

19 She moved after she began receiving the threats and was living in

20 Richmond and in Daly City.  Id. at 65.

21     Smith stated that after they were arrested, Sodapop and

22 Tennison, through their friends, were sending her messages to talk

23 to their attorneys.  Id. at 41, 66-67.  Smith told the "messengers"

24 that these requests were putting her in an awkward position because

25 Luther and Ricard had told her they would pay someone $10,000 to

26 kill her if she talked to anyone about the Shannon homicide.  Id.

27 at 40, 41.  Smith stated that she told the "messengers" not to give

28

1   her name, address or telephone number to either Sodapop or

2   Tennison.

3      Smith also stated that when she was a telephone operator, she

4   happened to "catch" collect calls placed by Sodapop and Tennison

5   when they were in jail. _Id._ at 67. Tennison asked her why she

6   hadn't said anything; he knew she had some information, but he did

7   not know that she had been a witness to the homicide. _Id._ at 67,

8   68. Smith stated that this chance telephone conversation was the

9   only time she spoke to Tennison. _Id._ at 67.

10     The first time she told anyone she was an eye-witness was two

11   days before this interview. _Id._ at 64. Butterworth asked her what

12   caused her to talk to somebody at this late date and she said, "I

13   don't know, but Jeff Adachi and Robert Stemme had gotten a hold of

14   my name, address and phone number and everything, and they had come

15   out to my house and talked to my mother, and she, Robert Stemme

16   gave her his phone number. And I called back." _Id._ at 64-65. She

17   stated that if Adachi had contacted her before the trial and he had

18   subpoenaed her, she would have had to testify. _Id._ at 45.

19     E. Declarations

20     In a declaration obtained by Tennison dated November 6, 2000,

21   Luther Blue stated that he was a witness to the shooting of Shannon

22   on August 19, 1989, that he had known Tennison and that Tennison

23   was not among the people at the scene of the shooting. Pet.'s Ex.

24   26. In a declaration obtained by Tennison dated June 25, 2001,

25   Anthony Jones, the person Smith called Mark Anthony, stated that on

26   the night of August 19, 1989, he, Blue and Ricard were passengers

27   in Smith's car, with Smith driving, and at a liquor store on Third

28                             62

Street they ran into several guys from Lakeview who were in a pick-up truck and two cars. Pet's Ex. 27 at 1. They all drove over to a 7-11 on Bayshore when a Buick Skylark drove by and the people got "all excited." Id. Smith said she thought it was her cousin in the Skylark. Id. Ricard jumped into the truck as it took off to chase the Skylark, followed by the two other cars and Smith's car. He saw the Skylark jamming into reverse ahead of them. Id. Blue told Smith to turn the corner and he jumped out of the car. He saw people getting out of vehicles to chase the driver of the Skylark. Id. Before long, he heard a big boom. Id. at 2. He was acquainted with Tennison and knew that he was not present that night. Id. The reason he did not come forward was because he was afraid he would implicate himself in the eyes of the police and because "there can be serious consequences for people who tell on other people." Id. at 2.

In a declaration obtained by Tennison dated June, 2003, Pauline Maluina stated that in late 1989, her then friend Masina Fauolo asked her to lie about having witnessed the murder of Roderick Shannon. Pet.'s Supplementation of Record, Ex. A at ¶ 4. Pauline stated that she did not witness Shannon's murder and was not even aware of it until Masina told her about it and told her some of the things she should say to the police and which person to point to if the police showed her a photo lineup. Id. at ¶¶ 4, 5. Pauline stated that when Inspector Hendrix questioned her about where she had been on the night of Shannon's murder, partly out of loyalty to Masina, and partly out of fear of her, Pauline told him that she had witnessed the killing. Id. at ¶ 6. Pauline stated

63

United States District Court

For the Northern District of California

that her testimony at Tennison and Goff's trial that she had

witnessed Shannon's murder was a lie that she did not want to tell,

but that she felt pressured to do so by Masina, the police and the

prosecutor.  _Id._ at ¶ 8.

LEGAL STANDARD

I. Standard of Review of State Court Determinations

Under the Antiterrorism and Effective Death Penalty Act of

1996 (AEDPA), a district court may grant a petition challenging a

State conviction or sentence on the basis of a claim that was

reviewed on the merits in State court only if the State court's

adjudication of the claim: "(1) resulted in a decision that was

contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the

United States; or (2) resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence

presented in the State court proceeding."  28 U.S.C. § 2254(d).  In

any event, habeas relief is warranted only if the constitutional

error at issue is structural error or had a "'substantial and

injurious effect or influence in determining the jury's verdict.'"

_Penry v. Johnson_, 532 U.S. 782, 795 (2001) (quoting _Brecht v.

Abrahamson_, 507 U.S. 619, 638 (1993)).

"Clearly established federal law, as determined by the Supreme

Court of the United States" refers to "the holdings, as opposed to

the dicta, of [the Supreme] Court's decisions as of the time of the

relevant state-court decision."  _Williams v. Taylor_, 529 U.S. 362,

412 (2000); _see Alvarado v. Hill_, 252 F.3d 1066, 1068-69 (9th Cir.

2001) ("the question . . . is not whether [State law] violates due

64

process as that concept might be extrapolated from the decisions of the Supreme Court. Rather, it is whether [State law] violates due process under 'clearly established' federal law."). "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." Williams, 529 U.S. at 412. A State court decision may no longer be overturned on habeas review simply because of a conflict with circuit-based law. Van Tran v. Lindsey, 212 F.3d 1143, 1154 (9th Cir.), overruled on other grounds in Lockyer v. Andrade, 123 S.Ct. 1166 (2003); Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 1999); Moore v. Calderon, 108 F.3d 261, 264 (9th Cir.), cert. denied, 521 U.S. 1111 (1997). Nonetheless, circuit decisions may still be relevant as persuasive authority to determine whether a particular State court holding is an "unreasonable application" of Supreme Court precedent or to assess what law is "clearly established." Van Tran, 212 F.3d at 1154; Duhaime, 200 F.3d at 600.

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the State court arrives at a conclusion opposite to that reached by this Court on a question of law or if the State court decides a case differently than this Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. As summarized by the Ninth Circuit: "A state court's decision can be 'contrary to' federal law either 1) if it fails to apply the correct controlling authority, or 2) if it applies the controlling authority to a case involving facts 'materially indistinguishable' from those in a controlling case, but nonetheless reaches a different result." Van Tran, 212 F.3d at 1150 (citing Williams,

529 U.S. at 405-07).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the State court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 412-13.

Under 28 U.S.C. § 2254(d)(2), a federal habeas court may grant the writ if it concludes that the State court's adjudication of the claim resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." <u>Torres v. Prunty</u>, 223 F.3d 1103, 1107 (9th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(2) and <u>Williams</u>, 529 U.S. at 412-13). The "clearly erroneous" standard of unreasonableness that applies in determining the "unreasonable application" of federal law under § 2254(d)(1) also applies in determining the "unreasonable determination of the facts in light of the evidence" under § 2254(d)(2). <u>Id.</u> at 1107-08 (citing <u>Van Tran</u>, 212 F.3d at 1153-54). To grant relief under § 2254(d)(2), a federal court must be "left with a firm conviction that the determination made by the state court was wrong and that the one [petitioner] urges was correct." <u>Id.</u> at 1108 (quoting <u>Van Tran</u>, 212 F.3d at 1153-54) (internal quotation marks omitted). A district court must presume correct any determination of a factual issue made by a State court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

In determining whether the State court's decision was contrary

66

**United States District Court**

For the Northern District of California

to, or involved an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest State court to address the merits of a petitioner's claim in a reasoned decision. <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803-04 (1991); <u>LaJoie v. Thompson</u>, 201 F.3d 1166, 1172 n.9 (9th Cir. 2000).

The standard of review under AEDPA is somewhat different where the highest State court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim. In such a case, a review of the record is the only means of deciding whether the State court's decision was objectively reasonable. <u>Greene v. Lambert</u>, 288 F.3d 1081, 1089 (9th Cir. 2002); <u>Bailey v. Newland</u>, 263 F.3d 1022, 1028 (9th Cir. 2001); <u>Delgado v. Lewis</u>, 223 F.3d 976, 982 (9th Cir. 2000). When confronted with such a decision, a federal court should conduct "an independent review of the record" to determine whether the State court clearly erred in its application of controlling federal law. <u>Id.</u> The federal court need not otherwise defer to the State court decision under AEDPA: "A state court's decision on the merits concerning a question of law is, and should be, afforded respect. If there is no such decision on the merits, however, there is nothing to which to defer." <u>Greene</u>, 288 F.3d at 1089. In sum, "while we are not required to defer to a state court's decision when that court gives us nothing to defer to, we must still focus primarily on Supreme Court cases in deciding whether the state court's resolution of the case constituted an unreasonable application of clearly established federal law."

1  <u>Fisher v. Roe</u>, 263 F.3d 906, 914 (9th Cir. 2001), <u>abrogated on</u>

2  <u>other grounds</u>, <u>Mancuso v. Olivarez</u>, 292 F.3d 939, 944 n.1 (9th Cir.

3  2002). A summary decision by a State court does not "implicitly"

4  make any factual findings in support of the decision. <u>Id.</u> at 913

5  (refusing to infer factual findings from State court summary denial

6  of habeas petition).

7      Here, because the State courts did not provide a reasoned

8  decision on any of Tennison's constitutional claims, this Court

9  must conduct "an independent review of the record" to determine

10  whether the State court clearly erred in its application of

11  controlling federal law. <u>See</u> <u>Delgado</u>, 223 F.3d at 982); <u>Greene</u>,

12  288 F.3d at 1089.

13                              DISCUSSION

14      Tennison argues that he is entitled to habeas relief on four

15  grounds: (1) violation of his due process rights guaranteed by the

16  Fourteenth Amendment based on his actual innocence and on the

17  State's failure properly to address evidence of his actual

18  innocence; (2) violation of his Fourteenth Amendment due process

19  rights based on the prosecution's failure to reveal exculpatory

20  evidence, the prosecutor's reliance on perjured testimony, and the

21  prosecutor's failure to gather and maintain additional exculpatory

22  evidence; (3) violation of his Sixth Amendment right to effective

23  assistance of counsel based on the deficient performance of LeRue

24  Grim; (4) the error resulting from the cumulative effect of the

25  foregoing violations.

26      As discussed below, the Court grants the petition based upon

27  Supreme Court jurisprudence articulated in <u>Brady v Maryland</u>, 373

28                                   68

1  U.S. 83 (1963) and its progeny.  The Court does not address

2  Tennison's other arguments.

3  I. Legal Standard

4      In <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the Supreme Court

5  held that "the suppression by the prosecution of evidence favorable

6  to an accused upon request violates due process where the evidence

7  is material either to guilt or to punishment, irrespective of the

8  good faith or bad faith of the prosecution." <u>Id.</u> at 87.  The

9  Supreme Court later made clear that the duty to disclose such

10  evidence applies even when there has been no request by the

11  accused, <u>United States v. Agurs</u>, 427 U.S. 97, 107 (1976), and that

12  the duty encompasses impeachment evidence as well as exculpatory

13  evidence, <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985).

14  Evidence is material "if there is a reasonable probability that,

15  had the evidence been disclosed to the defense, the result of the

16  proceeding would have been different.  A 'reasonable probability'

17  is a probability sufficient to undermine confidence in the

18  outcome." <u>Id.</u> at 682.

19      "There are three components of a true <u>Brady</u> violation: [t]he

20  evidence at issue must be favorable to the accused, either because

21  it is exculpatory, or because it is impeaching; that evidence must

22  have been suppressed by the State, either willfully or

23  inadvertently; and prejudice must have ensued." <u>Strickler v.</u>

24  <u>Greene</u>, 527 U.S. 263, 281-82 (1999).  Prejudice will be found if

25  the suppressed evidence was "material" under State law to the

26  accused's guilt or punishment. <u>Anderson v. Calderon</u>, 232 F.3d

27  1053, 1062, 1066 (9th Cir. 2000).

28                                    69

Neither the prosecutor's good faith nor actual unawareness of exculpatory evidence in the government's hands is determinative of the prosecution's disclosure obligations. <u>Carriger v. Stewart</u>, 132 F.3d 463, 479 (9th Cir. 1997) (en banc); <u>United States v. Kearns</u>, 5 F.3d 1251, 1254 (9th Cir. 1993). Rather, the prosecution has a duty to learn of any exculpatory evidence known to others acting on the government's behalf. <u>Kyles v. Whitley</u>, 514 U.S. 419, 437-38 (1995). This includes exculpatory information in the hands of the police. <u>Id.</u> Because the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned. <u>Id.</u>

A defendant need only demonstrate a reasonable probability that the result of the proceeding would have been different. <u>United States v. Kojayan</u>, 8 F.3d 1315, 1322 (9th Cir. 1993). The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial. <u>Kyles</u>, 514 U.S. at 434; <u>United States v. Golb</u>, 69 F.3d 1417, 1430 (9th Cir. 1995) (ultimate question is whether there is reasonable probability that had material been disclosed, result of proceeding would have been different such that confidence in outcome is undermined).

Whether a "reasonable probability" exists may not be based on mere speculation without adequate support. <u>Wood v. Bartholomew</u>, 516 U.S. 1, 6-8 (1995); <u>see, e.g.</u>, <u>Downs v. Hoyt</u>, 232 F.3d 1031, 1037 (9th Cir. 2000) (rejecting as speculative argument that withheld material might have led to some admissible evidence which

1   might have been sufficiently favorable to meet the <u>Bagley</u>

2   standard).

3       As noted, impeachment, as well as exculpatory, evidence falls

4   within the <u>Brady</u> rule.  <u>Bagley</u>, 473 U.S. at 676; <u>Giglio v. United</u>

5   <u>States</u>, 405 U.S. 150, 154-55 (1972).  "<u>Brady</u> information

6   [therefore] includes 'material . . . that bears on the credibility

7   of a significant witness in the case.'"  <u>United States v. Brumel-</u>

8   <u>Alvarez</u>, 991 F.2d 1452, 1461 (9th Cir. 1992) (quoting <u>United States</u>

9   <u>v. Strifler</u>, 851 F.2d 1197, 1201 (9th Cir. 1988), <u>cert. denied</u>, 489

10  U.S. 1032 (1989)); <u>see, e.g.</u>, <u>Killian v. Poole</u>, 282 F.3d 1204, 1210

11  (9th Cir. 2002) (conviction reversed where undisclosed letters

12  would have been valuable to the defense in impeaching "make-or-

13  break" witness' credibility before the jury); <u>Singh v. Prunty</u>, 142

14  F.3d 1157, 1161-63 (9th Cir. 1998) (petitioner entitled to habeas

15  relief where prosecution suppressed evidence of agreement to

16  provide benefits to key witness in exchange for his testimony, and

17  reasonable probability existed that had evidence been disclosed one

18  or more members of jury would have viewed the testimony

19  differently).

20      The materiality of suppressed evidence is considered

21  collectively, not item by item.  <u>See</u> <u>Kyles</u>, 514 U.S. at 436;

22  <u>Carriger v. Stewart</u>, 132 F.3d 463, 480 (9th Cir. 1997) (en banc).[12]

23      In <u>Agurs</u>, the Supreme Court explained materiality under <u>Brady</u>

24

25      [12]The government cannot satisfy its <u>Brady</u> obligation to
    disclose exculpatory evidence by making some evidence available and
26  claiming the rest would be cumulative.  <u>Carriger</u>, 132 F.3d at 481.
    Rather, the government is obliged to disclose all material
27  information.  <u>Id.</u> at 481-2.

28                                   71

as follows:

> The proper standard of materiality must reflect our
> overriding concern with the justice of the finding of
> guilt. Such a finding is permissible only if supported
> by evidence establishing guilt beyond a reasonable doubt.
> It necessarily follows that if the omitted evidence
> creates a reasonable doubt that did not otherwise exist,
> constitutional error has been committed. This means that
> the omission must be evaluated in the context of the
> entire record. If there is no reasonable doubt about
> guilt whether or not the additional evidence is
> considered, there is not justification for a new trial.
> On the other hand, if the verdict is already of
> questionable validity, additional evidence of relatively
> minor importance might be sufficient to create reasonable
> doubt.

Agurs, 427 U.S. at 112-113.

II. Strength of Case Against Tennison

Because Brady omissions must be evaluated in the context of the entire record, before analyzing the individual items of suppressed evidence, the Court will assess the strength of the case against Tennison. Respondent implies that the case against Tennison was strong, but focuses on discrediting the evidence presented by Tennison rather than citing the record to establish that the evidence presented at trial was strong. The Court finds that the prosecution's case against Tennison was weak.

No physical evidence was presented at trial tying Tennison to Shannon's shooting. The prosecution's entire case was dependent upon the testimony of Masina and Pauline, two young girls whose eyewitness identifications of Tennison were questionable. The stories presented by Masina and Pauline are internally inconsistent, inconsistent with each other and inconsistent with physical evidence and the neighbors' evidence regarding the car chase.

1     In his closing argument, Butterworth suggested to the jury

2 that, in considering the charges against Tennison, they should look

3 at the conspiracy charge first because Tennison "was not the one

4 who pulled the trigger, his liability for the homicide is bound up

5 in what you find the nature of the conspiracy to have been."  RT at

6 982.  Butterworth summed up the evidence linking Tennison to the

7 conspiracy as follows:  (1) Masina's identification of Tennison at

8 Lovers' Lane; (2) Masina's identification of Tennison as the driver

9 of the yellow Skylark; (3) Masina's testimony that the yellow

10 Skylark rammed Patrick's car; (4) Masina and Pauline's

11 identification of Tennison as one of the people at the Super Fair

12 parking lot; and (5) Masina and Pauline's identification of

13 Tennison as holding Shannon when he was shot.  RT at 982-83.

14     Butterworth had previously listed other evidence that

15 indicated the existence of a conspiracy: (1) the act of gathering

16 at Lovers' Lane, if that was done in furtherance of a conspiracy to

17 kill; (2) the statements at Lovers' Lane; (3) chasing Patrick's

18 car; (4) ramming the car; (5) firing the gun at the car.  RT at

19 980-82.

20     Butterworth did not indicate to the jury what items of

21 evidence established that Tennison was guilty of first degree

22 murder.

23     A. Identification at Lovers' Lane

24     At trial, Masina first testified that she was not aware of the

25 identity of the occupants of the cars parked behind her at Lover's

26 Lane, she just knew they were "HP niggers."  RT at 372.  Later,

27 Masina testified that she recognized Tennison in the Skylark parked

28                                    73

behind her at Lovers' Lane when she looked in the rear view mirror of her car. RT at 448. Later still, Masina testified that she saw Tennison at Lovers' Lane when he was driving into the Lovers' Lane parking lot and that she couldn't see him when the cars were parked because "they was in back of us." RT at 609-10. Masina previously had told Hendrix during the formal interview on October 31, 1989, that she did not recognize any of the people at Lovers' Lane. RT at 566-67. Masina had also testified at Tennison's preliminary hearing that she did not recognize anyone at Lovers' Lane. RT at 568.

Thus, Masina's testimony was internally inconsistent. It would be difficult, looking through the rear-view mirror of a car, to recognize a face in another car either driving into a dark parking lot or parked in a dark parking lot. The evidence that Masina actually saw and recognized Tennison in a yellow Skylark in the Lovers' Lane parking lot was weak.

Pauline testified that she did not recognize anyone at the Lovers' Lane parking lot, and she did not hear the threat against Pat.

B. Identification of Tennison as Driving a Yellow Skylark

It follows that if Masina did not recognize Tennison at the Lovers' Lane parking lot, she could not know that he was driving a yellow Skylark. Furthermore, Masina testified that at the Super Fair parking lot, she saw Tennison come out of one of the cars, but she could not remember which car. RT at 431. Later, Butterworth asked her when she first saw Tennison that night and Masina responded that she knew Tennison was driving the yellow Skylark on

74

the night in question because she had seen him in a yellow Skylark

before.  RT at 446-48.  Pauline never identified Tennison in a

yellow Skylark.

C. Yellow Skylark Rammed Patrick's Car

The following is Masina's testimony regarding the ramming of

Patrick's car, the green Skylark:

> Q: Do you know whether while the green Skylark was going down Visitacion any of the other cars ever touched it in any way?
>
> A: Yes.
>
> Q: Do you remember which car or the truck it was that actually touched the green Skylark?
>
> A: The one I was in back of it.  The Skylark.
>
> Q: Which one?
>
> A: The one that I was in back of, the green Skylark.
>
> Q: So that would be the yellow Skylark?
>
> A: Yes.
>
> Q: That would be the first car that was out of the parking lot?
>
> A: Yes.
>
> Q: Do you remember where that occurred, where that contact between those two cars occurred?
>
> A: I don't know.  But I know it hit it.
>
> Q: All right.  Was that before or after the car crashed, the green Skylark?
>
> A: I don't remember.

RT at 387-88.

Based on Masina's testimony, it is unlikely that she actually

witnessed a yellow Skylark hit Patrick's car.  According to

Masina's testimony, directly in front of Masina's car was the pick-

up truck, then two other cars, then the yellow Skylark and then Patrick's car. The prosecution never tried to explain how Masina could see the cars in front of the pick-up let alone notice that the yellow Skylark, the fourth car in front of Masina's car, hit Patrick's car, the fifth car in front of her car, as the cars were racing down a winding street, not even stopping at stop signs, and Masina was racing down behind them to catch up to them and then keep up with them.

Furthermore, Pauline testified that there was a car, not a truck, directly in front of the car she and Masina were in. RT at 233. Pauline had also testified that, as they were speeding down Visitacion, she could not see the cars in front of the vehicle that was directly in front of the car she and Masina were in. RT at 233.

### D. Identification of Tennison in Super Fair Parking Lot and Tennison Holding Victim

Masina and Pauline's testimony that they identified Tennison as the person, or one of the people, holding Shannon when he was shot is very sketchy, as is evident from the summary of it in the factual background section above. Pauline testified that Tennison was holding Shannon on Shannon's left side "like on one side of the arm," but couldn't remember if she saw Tennison holding Shannon with one hand or both hands. RT at 150-51. Pauline remembered another person holding Shannon on the right side at the same time Tennison was holding him on the left. RT at 153-54. Pauline testified that before the person with the gun shot Shannon, the two people who had been holding Shannon let go of him. RT at 155.

1  Later, Pauline testified that she couldn't see how Tennison was
2  holding Shannon because there were a lot of people in the way.   RT
3  at 239.   She couldn't see Tennison's hand because she was looking
4  at him toward the side.   RT at 239-40.   Pauline confirmed, on
5  cross-examination, that nobody was holding Shannon when he was
6  shot.   RT at 283.

7       Masina testified only that Tennison was one of the people that
8  dragged Shannon off the fence.   RT at 431.   About forty or fifty
9  seconds before Goff fired the gun at Shannon, Masina saw the young
10  men who had been around Shannon back up.   RT at 440-41.

11       Based upon the girls' testimony, a fact-finder might conclude
12  that Tennison was among the people who pulled Shannon down from the
13  fence and that, at some point, he and another person may have been
14  holding Shannon.   However, there is no testimony that Tennison was
15  holding Shannon just before he was shot.

16       Thus, only one of the facts that Butterworth argued would link
17  Tennison to the conspiracy to commit murder -- Pauline and Masina's
18  identification of him as one of the people in the Super Fair
19  parking lot -- was actually testified to by both girls.

20       E. Inconsistencies Between Masina and Pauline's Testimony and
          Other Evidence
21
22       Pauline and Masina's testimony is further weakened by other
23  evidence.   The neighbor witnesses heard tires screeching and
24  shotgun blasts during the chase.   They saw Shannon's car driving in
25  reverse down the street at a high rate of speed.   They saw the
26  black pick-up truck chasing Shannon also switch into reverse and,
27  driving backward at a high rate of speed, continue chasing

28                                    77

1 Shannon's car until Shannon lost control of his car and it crashed
2 into a fence. The neighbors heard only one gunshot from the Super
3 Fair parking lot which came within a few minutes after the car
4 crash. RT at 26, 48. A police investigator testified that
5 Shannon's car had recently been damaged by a shotgun blast at close
6 range between the driver's door and the rear panel. RT at 84.

7 In contrast, Masina and Pauline testified that the car chase
8 went in a straight line down Visitacion, until Shannon's car
9 crashed into a fence. Although Masina said the cars never left her
10 sight, she never saw either Shannon's car or the black pick-up
11 truck, which she said she was directly behind, drive in reverse.
12 Neither Masina nor Pauline testified that they heard shotgun blasts
13 during the chase.

14 Masina testified that she saw boys beating Shannon with fists
15 and baseball bats. RT at 582. However, the coroner testified that
16 there was no physical evidence that Shannon had been beaten with
17 baseball bats. RT at 106, 112. Masina reported hearing four or
18 five shots when Shannon was killed. RT at 441. Masina and Pauline
19 testified that they left the stolen car on Visitacion close to the
20 murder scene, but no stolen vehicle was ever found there. RT at
21 458, 133, 713-14.

22 F. Other Credibility Factors

23 When Hendrix first interviewed Pauline, he was suggesting the
24 relevant information about the homicide to her rather than
25 questioning her to see if her story corroborated the story told by
26 Masina. She remembered very little and what she did remember was
27 inconsistent with Masina's version. See e.g., Interview quoted in

28

78

1  § IIF, above; RT at 259-263. Pauline's testimony at Tennison's

2  § 707 hearing was different from her testimony at trial. At the

3  § 707 hearing, Pauline had not identified Tennsion. Then, Pauline

4  recanted her testimony that she was at the scene of the murder at

5  all and she persisted in that recantation for three days. She was

6  given a lie detector test and was encouraged by the polygrapher to

7  return to her original story. Hendrix then arranged for her to

8  speak privately, in an unmonitored telephone conversation, with

9  Masina, the person Pauline said had persuaded her to lie in the

10  first place. This was extraordinarily suggestive police procedure.

11  Therefore, the credibility of one of the prosecution's two eye-

12  witnesses was extremely questionable. This conclusion is

13  strengthened by Pauline's 2003 declaration in which she states that

14  she did not testify truthfully at Tennison's trial and she was not

15  present when Shannon was shot.

16      Masina's earlier statements conflicted with some of the

17  testimony she gave at the trial. Some of the testimony was

18  internally inconsistent and some was inherently improbable. If

19  Pauline witnessed the events, her failure to corroborate Masina on

20  important points is noteworthy. If Pauline was not a witness, then

21  Masina lied repeatedly and suborned perjury. Therefore, although

22  Masina's credibility was not as compromised as Pauline's, her

23  credibility and identification of Tennison were also questionable.

24      In sum, given that only-Pauline and Masina's evidence linked

25  Tennison to any criminal activity, that their testimony conflicted

26  with other evidence, that Pauline's credibility was highly

27  questionable, and that Masina's credibility was somewhat

28                                    79

1 questionable, the Court finds that the prosecution's case against

2 Tennison was weak.

3 III. Withheld Evidence

4    Tennison argues that the prosecution committed <u>Brady</u>

5 violations by suppressing the following exculpatory or impeachment

6 evidence which was produced to Tennison pursuant to this Court's

7 2001 discovery order: (1) Sanders and Hendrix' approved request for

8 $2,500 from the Secret Witness Fund and the undisclosed disposition

9 of those funds; (2) Pauline's polygraph interview and test;

10 (3) Smith's pre-trial statements to the police; and (4) Blue's

11 February 9, 1990 police interview.  Tennison argues that the

12 prosecution's suppression of Ricard's November 7, 1990 confession

13 for over six months until the last day of testimony at the hearing

14 on Tennison's motion for new trial also constitutes a <u>Brady</u>

15 violation.  Respondent does not dispute that the four items of

16 evidence were not produced to Adachi.  Nor does Respondent dispute

17 that the prosecution should have provided Ricard's November 7, 1990

18 confession to Tennison's trial attorney in a more timely fashion.

19 Respondent proffers other arguments, which will be addressed below.

20    A. The Secret Witness Fund

21    Six weeks after Masina came forward as a witness, Hendrix

22 requested and received approval for $2,500 from the Secret Witness

23 Program to encourage witnesses to come forward in the Shannon

24 murder case.  <u>See</u> Pet.'s Ex. 31.  At his deposition, Hendrix said

25 he could not remember what happened to the $2,500.  Resp.'s Ex. K

26 at 125-32.  Tennison argues that because Masina was the only known

27 witness at that time, the only reasonable inference is that Hendrix

28                                    80

United States District Court

For the Northern District of California

used the money to pay Masina to testify. Tennison argues that the prosecution's suppression of these facts is a violation of <u>Brady</u> and <u>Giglio</u> because prosecutors must disclose any benefits given to a government witness. Tennison states that if Adachi had known about the payment, he would have been able to pursue discovery to ascertain the recipient of the money and used that information as powerful impeachment testimony.

Respondent counters that because Masina had come forward as a witness six weeks before the reward request was submitted, she would not qualify for a reward whose purpose was to encourage witnesses to come forward. Therefore, according to Respondent, the failure to disclose the request for the reward money is not a <u>Brady</u> violation because there is no showing of materiality.

Respondent's arguments are unpersuasive given that the prosecution is unable to explain who did receive this money. Whether the money was paid to another prosecution witness or was paid to Masina wrongfully to keep her as a good witness, the failure to disclose it was a <u>Brady</u> violation.

B. Pauline's Polygraph Examination

Tennison argues that if Adachi had known of the polygraph test given by police to Pauline, he would have been able to utilize the test, and the use the police made of it, in his cross-examination of Pauline. Tennison argues that Adachi "would have been able to establish that Pauline's testimony was coerced by the use of the polygraph (after two days of constant retractions) . . . [and] he would have been able to establish that Hendrix had not followed proper police procedure and had brought enormous pressure to bear

on a 14-year old girl who had already complained that her testimony had been coerced."

Citing <u>Wood v. Bartholomew</u>, 516 U.S. 1, 6-7 (1993), Respondent replies that even if Adachi had the information regarding Pauline's polygraph examination, he could not have used it to impeach her because California Evidence Code § 351.1 prohibits the admission of evidence concerning polygraph examinations.

California Evidence Code § 351.1 provides:

> (a) . . . the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding, including pretrial and post conviction motions and hearings . . . unless all parties stipulate to the admission of such results.

> (b) Nothing in this section is intended to exclude from evidence statements made during a polygraph examination which are otherwise admissible.

Tennison replies that even if § 351.1 would have excluded the results of the polygraph at trial, Respondent's suppression of the polygraph constitutes a <u>Brady</u> violation because "the prosecution can[not] use self-help in the form of evidence suppression to win its own motion in limine." Tennison also argues that under § 351.1(b), Pauline's statements to the police polygrapher that she was not a witness to the crime and had been coerced by Masina are admissible. In addition, Tennison argues the fact "that Hendrix turned Pauline over to another police inspector to challenge her recantation could have been used to show the prosecution's herculean efforts to force Pauline to recant."

The Court agrees. Regardless of § 351.1, California law requires the prosecution to inform the defense of polygraph results

that cast doubt on the credibility of a prosecution witness.  See
California v. Price, 1 Cal. 4th 324, 419-20 (1991), superceded by
statute on other grounds as stated in People v. Hinks, 58 Cal. App.
4th 1157, 1161-65 (1997).  Thus, California law does not excuse the
prosecution's failure to disclose this information.  Pauline's
statements to the police polygrapher that: (1) she was elsewhere at
the time of Shannon's shooting; (2) that she had told the police
that she was at the shooting because Masina asked her to do so;
and (3) that she was able to pick out Tennison from the photo
spread because Masina had described the photo to her, see Pet.'s
Ex. 37, were admissible under § 351.1(b).  In addition, the police
polygrapher's statement to Pauline that "if she had changed her
story because of fear of retaliation or intimidation she should not
do so because we would give her protection," see id., was
admissible to show that another police officer also told Pauline to
go back to her original story.

Bartholomew is distinguishable even though it involved a
situation where the prosecutor failed to produce polygraph
examinations of two of its witnesses and the State law regarding
the admissibility of polygraph examinations was similar to § 351.1.
Bartholomew, 516 U.S. at 5.  In Bartholomew, the Ninth Circuit
granted habeas relief and the Supreme Court reversed on the ground
that the Ninth Circuit was merely speculating when it concluded
that the disclosure of the polygraph to the defense would have
motivated the defense counsel to conduct additional discovery which
would have led to admissible evidence.  Id. at 6.  Here, Adachi
would not have had to undertake additional discovery to uncover

United States District Court
For the Northern District of California

admissible evidence.  Admissible evidence of Pauline's statements
to the police polygrapher and his statements to her was also
suppressed.  Particularly because Pauline's credibility was crucial
to the prosecution's case and because her credibility was already
highly suspect, this evidence should have been disclosed under
Brady.

Furthermore, Butterworth's questioning of Pauline reveals that
he may have been aware of the polygraph examination and may have
deliberately engaged in artful questioning to avoid the disclosure.
The questioning proceeded as follows:

> Q: Okay.  And you persisted, did you not, in saying that
> you weren't there when Cooly was killed?
>
> A: Yes.
>
> Adachi: I'm going to object at this time.  He's leading
> the witness.
>
> Butterworth: That's true.  I'll try to reframe that.
>
> Q: Did you maintain that position, that is, that you were
> not there, for a period of time?
>
> A: Yes.
>
> Q: And did you talk to some folks about that?
>
> A: About what?
>
> Q: Some people in the police department?
>
> A: Yes.
>
> Q: Okay, And Inspector Hendrix, the day after that, put
> you in contact --
>
> Did Inspector Hendrix the day after that put you in
> contact with Masina?

84

1     A: Yes.

2     RT at 193.

3     Butterworth avoided asking Pauline questions eliciting the

4     fact that Hendrix had sent her to Officer Hunter, that Pauline

5     continued to recant her prior statements and that he  encouraged

6     Pauline to retract her recantation.   This artful questioning is

7     troubling given that the prosecution should have disclosed evidence

8     related to the polygraph examination to Adachi prior to the trial.

9          C. Suppression of Smith's Identity and Pre-trial Statements

10         Tennison argues that, had the police told Adachi in January,

11    1990 of the identity of Chante Smith and the substance of her

12    statements, Adachi would have been able to: (1) interview Smith and

13    learn the full extent of her eyewitness testimony, including the

14    fact that Ricard was the actual killer and that the car chase

15    started at the Bayshore 7-11, not at Lovers' Lane; (2) interview

16    the individuals Smith named as eyewitnesses to the murder,

17    including Ricard, Blue and Mark Anthony Jones for corroboration;

18    (3) seek corroboration of Smith's version of the events, disputing

19    additional elements of Masina and Pauline's testimony; and

20    (4) subpoena additional witnesses for trial.   Tennison argues that

21    "Chante Smith was the thread that, when pulled, would cause the

22    prosecution's case against Tennison to unravel.   But the state's

23    suppression of Smith's statements exonerating Tennison robbed

24    Adachi of the opportunity to~pull the thread."

25         Respondent counters that any failure to disclose what the

26    prosecution knew about Smith before the trial did not violate

27    Tennison's due process rights because the information was not

28                                   85

United States District Court

For the Northern District of California

material and it was readily available to Tennison through the exercise of due diligence.

### 1. Materiality of Smith's Identity and Pre-trial Statement

The test for favorability and materiality relies on State law, not federal law. Anderson v. Calderon, 232 F.3d 1053, 1066 (9th Cir. 2000). The circuits are split regarding whether inadmissible evidence can form the basis for Brady claims. Paradis v. Arave, 240 F.3d 1169, 1178 (9th Cir. 2001). The Ninth Circuit has not decided this issue as yet. Id. at 1179. The Supreme Court has not rejected the suggestion that inadmissible evidence can be material under Brady, if it could have led to the discovery of admissible evidence. Id. at 1178 (citing Bartholomew, 516 U.S. at 6). In Bartholomew, the Supreme Court ruled that mere speculation that two polygraph tests that were inadmissible under State law even to impeach could have led to discovery of admissible evidence was insufficient to establish a Brady claim. Bartholomew, 516 U.S. at 8.

Therefore, to determine whether Smith's 1990 statement is material the Court must consider whether her testimony would have been admissible or whether, based on more than mere speculation, it would have led to admissible evidence. Smith's 1990 statement indicates that she could have testified that she was at the Sundial after Shannon's murder, that she heard the people at the Sundial talk about the shooting, that she heard Ricard make incriminating statements indicating that he was the shooter and that she could describe the cars that were at the scene of the shooting. Although

86

1  Smith's testimony regarding what she heard other people say might

2  have been excluded as hearsay, her testimony regarding Ricard's

3  statement at the Sundial would have been admissible as an admission

4  against interest, and her testimony identifying the cars would not

5  be hearsay and thus would be admissible.

6      Tennison argues further that had Adachi interviewed Smith, she

7  would have told him that she was an eyewitness to the crime and

8  this testimony would have been admissible.  That Smith did tell

9  Adachi she was an eyewitness when he contacted her in 1992 lends

10 credence to this claim.  Also, at the 1992 interview, when asked if

11 she would have testified at the trial if contacted by Adachi, she

12 said she would have had to if she had been subpoenaed.  See Pet.'s

13 Ex. 22 at 45.  However, her reason for lying about being an

14 eyewitness in 1990 was that she was scared and she did not want to

15 go to court to testify.  Smith did not explain what changed so that

16 in 1992 she was willing to reveal that she was an eyewitness.

17 Thus, it is not clear that Smith would have told Adachi that she

18 was an eyewitness to the murder.

19     Tennison argues that even if Smith would not have agreed to

20 testify as an eyewitness, her information would have led to

21 admissible evidence.  For instance, it would have led to Adachi's

22 interviews of Ricard, Blue and Anthony.  He would have discovered

23 that the chase started at the Bayshore 7-11 and would have been

24 able to prepare a defense to refute Masina and Pauline's version of

25 the car chase.  He could have interviewed employees at the Bayshore

26 7-11 to find a witness corroborating Smith's story, and he could

27 have looked for witnesses who would have denied seeing a chase down

28

1  Visitacion from Lovers' Lane. Without Smith's information, Adachi

2  did not have an alternative theory to the car chase down

3  Visitacion, and thus he had no reason to try to refute that part of

4  Masina and Pauline's testimony.

5      As evidence of Smith's trustworthiness, Tennison submits a

6  polygraph examination of Smith and declarations from two polygraph

7  experts that it is their opinion that Smith was telling the truth

8  about being an eyewitness to Shannon's murder. Pet.'s Exs. 56 and

9  57.

10      Respondent does not directly address Tennison's arguments.

11  Instead, Respondent claims that the information Smith provided

12  before the trial is not material because it was untrustworthy.

13  Respondent points out that, before the trial, Smith never said she

14  had been involved in the chase or that she was a witness to

15  Shannon's murder; she merely claimed to have heard that certain

16  individuals were involved in the chase and the murder and she

17  offered nothing further to corroborate her claim. Respondent

18  describes Smith's pre-trial contact with the police as a short

19  phone conversation in which "she simply provided a list of names of

20  individuals who might have been involved in the Roderick Shannon

21  murder. Chief Sanders described the phone conversation as 'kind of

22  mysterious.' At that time she did not give her last name or

23  address, only providing a contact number--a number the police could

24  call to get a message to her so she could call back later."

25      Citing Sanders' deposition, Respondent points out that after

26  Smith's 1992 statement, Sanders and Hendrix reviewed Tennison's

27  case file and tried to find corroboration for Smith's 1992

28                                    88

statement, but they could not do so.  See Resp.'s Ex. L at 102-03.
Respondent notes that Sanders determined that Smith's statement,
although superficially detailed, was in reality far too vague,
particularly for someone who claimed to have been present at a
traumatic event.  Id. at 105-06.  Respondent continues that Sanders
described Smith's information as of the quality and depth one could
have gleaned from reading newspaper accounts of the murder and
trial or from listening to talk on the streets.  Id. at 182-84.
Sanders also testified that Smith's body language added to his
doubts about Smith's credibility.  Id. at 92.  Sanders concluded
that Smith was "trying to put information into a case that was not
only inaccurate, [but] that had some other motive behind it."  Id.

As evidence of Smith's untrustworthiness, Respondent lists the
inconsistencies in Smith's 1992 statement and the inconsistencies
between her statement and Ricard's 1990 confession.  Respondent
theorizes, without any evidence, that Smith and Ricard conspired
together to present just enough evidence to cast reasonable doubt
on Tennison's guilt, but not to implicate themselves.

Respondent's description of Smith's pretrial contact with the
police is only partially correct.  Sanders talked to Smith again
before the trial.  Resp.'s Ex. L (Sanders Depo.) at 146-50.  After
Smith's initial January 3, 1990 phone contact with Sanders, he and
Hendrix went out to Smith's residence and spoke with her in the
parking lot.  Pet.'s Ex. 22 at 61-62.  During one of her pre-trial
conversations with Sanders and Hendrix, Smith told them that Ricard
was the person who shot Shannon.  Id.  Smith also described the
pick-up truck to Sanders and Hendrix, and they had three GTF

officers interview Smith at her house and show her photos of the truck to see if she could recognize it. Id. at 62. At the 1992 Smith interview, Sanders acknowledged that he had spoken to Smith before the trial and that she had told him that Ricard was the shooter. Id. at 61. At his deposition, Sanders disclosed that after he spoke to Smith, he and Hendrix followed up by interviewing several of the people she had named as being at the scene of Shannon's murder. Resp.'s Ex. L. at 46, 149, see also, Pet.'s Exs. 39 (February 8, 1990 interview with Ricard) and 23 (February 9, 1990 interview with Blue).

Furthermore, during the interviews of Blue and Ricard, Sanders and Hendrix stated that they considered the source of the information that Blue and Ricard were involved in the Shannon homicide to be reliable. Because Sanders and Hendrix interviewed Blue and Ricard immediately after Sanders spoke to Smith, it can be inferred that Sanders and Hendrix were referring to Smith as the reliable source of the information. The actions of Sanders and Hendrix indicate that they felt Smith's information about the crime was relevant and trustworthy enough to follow up on. Furthermore, Sanders assumed that the information Smith had given to him, including Smith's identity, had been turned over to the district attorney and that the district attorney had given this information to Adachi. Resp.'s Ex. L at 122-23. This also indicates Sanders thought the information material to Tennison's defense. Although there are inconsistencies in Smith's statement and between her statement and Ricard's confession, there are fewer inconsistencies in Smith's story than in the statements of Masina and Pauline, as

90

discussed above.

Most importantly, Sanders' view of the credibility of Smith's 1992 statement is not relevant to whether Smith's pre-trial statement and identity were material to Tennison's defense under Brady. The issue under Brady is not whether Smith's statement was true, but whether there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. Under Brady, the prosecution should have turned over Smith's 1990 statement to Adachi.

Furthermore, as discussed below in regard to Ricard's confession, if Smith's information had been disclosed, she could have testified at the motion for new trial, and important parts of Ricard's confession would have been corroborated, which would have been a significant factor in the trial judge's analysis of whether Ricard's confession was trustworthy. It is reasonable to assume that after Ricard confessed, Smith would have no reason to fear retaliation from Ricard or Blue if she testified that she had been an eyewitness to Shannon's shooting. A discussion of the effect of Smith's statement on the motion for new trial is addressed below.

2. Availability of Smith Information to Defense

Respondent also argues that the failure to disclose Smith's pretrial statement to the defense does not constitute a Brady violation because the information was readily available to Tennison's counsel through the exercise of due diligence.

"Since suppression by the Government is a necessary element of a Brady claim, if the means of obtaining the exculpatory evidence has been provided to the defense, the Brady claim fails." United

United States District Court

For the Northern District of California

States v. Dupuy, 760 F.2d 1492, 1501 n.5 (9th Cir. 1985) (citations

omitted). A defendant cannot claim a Brady violation if his

counsel was "aware of the essential facts enabling him to take

advantage of any exculpatory evidence." United States v. Shaffer,

789 F.2d 682, 690 (9th Cir. 1986); see, e.g., United States v.

Bracy, 67 F.3d 1421, 1428-29 (9th Cir. 1995) (where government

discloses all information necessary for defense to discover alleged

Brady material on its own, government is not guilty of suppressing

evidence). However, the availability of particular statements

through the defendant himself does not negate the government's duty

to disclose. United States v. Howell, 231 F.3d 615, 625 (9th Cir.

2000). "Defendants often mistrust their counsel, and even

defendants who cooperate with counsel cannot always remember all of

the relevant facts or realize the legal importance of certain

occurrences." Id. Consequently, defense counsel is entitled to

plan his trial strategy on the basis of full disclosure by the

government, regardless of the defendant's knowledge or memory of

the disclosed statements. Id.

Respondent argues that Tennison could have discovered the

pretrial information Smith gave to the police because this

"information was a matter of general knowledge on the streets

shortly after the shooting occurred." Opp. at 27. Citing Smith's

1992 statement, Respondent argues that (1) Ricard told people what

he had done; (2) about a week after the incident, Ricard told Goff,

Tennison's co-defendant, that Ricard had shot Shannon and the names

of the people who were at the scene of the shooting including

Smith; (3) Smith said she was getting messages from Goff and

92

Tennison through their friends to come down and talk to them before trial; (4) Smith spoke to Tennison by happenstance while she was working as an operator for Pacific Bell and Tennison placed a collect call from the jail and he asked Smith why she had not said anything about the murder.

Citing Resp.'s Ex. L at 92 (Sanders' Depo), Respondent argues that Smith was a gang associate and thus known to Goff and Tennison. Respondent argues that if Goff knew that Ricard was the shooter, "it strains credulity . . . to think that Goff would have failed to provide this information to his attorney, who was sharing information with Adachi."

Respondent's argument that Adachi could have discovered or did discover Smith's information from Goff's attorney or "from the street" is unpersuasive. The record of the motion for new trial indicates that Tennison diligently searched for witnesses to the Shannon murder, that he did not know Goff personally and that it was only after he was convicted that he heard from Luther Blue of a person named Chauntey White, whom his brother and Adachi could not locate. See RT at 173, 228 (Motion for New Trial). It was only after he had been convicted that he heard that a person named Lavinsky or Lavista Ricard had knowledge about the Shannon murder. Id. at 158. Furthermore, even if Goff knew about Ricard's involvement and told his attorney about it, Respondent points to no evidence that indicates that Adachi and Goff's attorneys communicated with each other about exculpatory evidence they had

93

1  gathered.[13]  Respondent also fails to point to any evidence that

2  Goff or his attorney knew of Ricard's identity or involvement in

3  the Shannon murder.  Further, in <u>Shaffer</u>, 789 F.2d at 690, the

4  Ninth Circuit advised that "because the trial strategies of co-

5  defendants often conflict . . . , we do not think it prudent to

6  allow the government to satisfy its due process requirements to

7  each of several defendants by merely giving exculpatory evidence to

8  one defendant."  Here, Respondent did not provide Smith's statement

9  to Tennison's co-defendant; he may not rely on mere argument that

10  Goff discovered the information and provided it to Tennison.

11      Finally, Smith's statement in 1992, that she coincidentally

12  was the operator when Tennison placed a telephone call from jail

13  and she spoke to him briefly, only establishes that Tennison did

14  not have her phone number or address and did not know how to get in

15  touch with her.  Pet.'s Ex. 22 at 45, 48.  Smith's statement does

16  not indicate whether this conversation occurred before or after

17  Tennison's conviction.  At the time of the motion for new trial,

18  the only information known to Tennison was that a person named

19  Chauntey White may have been involved with the Shannon murder, but

20  after searching for her, he had been unable to locate her.

21      In sum, the record establishes that Tennison had some vague

22

23      [13]Respondent cites RT 44, 65-66 (Sentencing Hearing) as
24  evidence that Adachi and Goff's attorney shared defense
    information.  However, on these pages Adachi only states that he
25  advised Tennison not to put on an alibi defense because Goff's
    attorney indicated that if he did, Goff would also put on an alibi
26  defense.  Further, Adachi states that he did not learn of Goff's
    alibi defense from talking to Goff or to his attorney, but from a
27  taped statement.  This does not establish that the two attorneys
    shared information with each other.

28

1  information about Smith, that he did diligently search for her, but

2  his diligent search was unsuccessful.

3      Respondent cites two cases from other circuits for the

4  proposition that material known and available to the defendant

5  cannot said to have been suppressed by the government. See <u>Coe v.</u>

6  <u>Bell</u>, 161 F.3d 320, 344 (6th Cir. 1998) and <u>United States v.</u>

7  <u>McMahon</u>, 715 F.2d 498, 501 (11th Cir. 1983). These cases are

8  distinguishable.

9      In <u>Coe</u>, the court noted that several of the items of evidence

10  that Coe claimed had been withheld by the prosecution were actually

11  not under the sole control of the government or improperly kept

12  from Coe. <u>Coe</u>, 161 F.3d at 344. The court noted that it was not

13  clear whether the government deprived Coe of any information

14  because much of the evidence about which he complained was used by

15  the defense at trial. <u>Id.</u> Further, the court stated that even if

16  Coe had met his burden of proving the government failed to disclose

17  information it should have provided to Coe, that evidence was not

18  material. <u>Id.</u> at 345.

19      Here, the evidence at issue was not available to Tennison, he

20  did not use the evidence at trial, and, as discussed above, the

21  evidence is material.

22      In <u>McMahon</u>, the evidence at issue was two psychiatric reports

23  that defense counsel "knew, or should have known, about . . . long

24  before the day of trial because the existence of the reports was

25  revealed at the trial of appellants' co-defendant." <u>McMahon</u>, 715

26  F.2d at 501. Furthermore, the court found that the psychiatric

27  reports were not material under <u>Brady</u>. <u>Id.</u> Here, the evidence was

28

1  not similarly revealed and the evidence is material under <u>Brady</u>.

2  The evidence shows that Tennison did not know of Smith or of

3  the evidence she had. However, the prosecution would not be

4  excused from providing Smith's statement to Adachi even if Tennison

5  had known of her identity.

6  D. Suppression of Videotaped Luther Blue Interview

7  Tennison points out that during the February 9, 1990 interview

8  of Blue, Sanders revealed that he had information that contradicted

9  the testimony of Masina and Pauline on which the prosecution relied

10  at trial. Specifically, Sanders told Blue that he knew the car

11  chase began at a 7-11[14] and that Blue was present during the car

12  chase and murder. <u>See</u> Pet.'s Ex. 23 at 19, 27. Tennison argues

13  that this is exculpatory and impeachment evidence that should have

14  been turned over under <u>Brady</u> and <u>Giglio</u>. Tennison believes that it

15  would have led Adachi to interview Blue and to subpoena him to

16  testify at trial. Citing Blue's 2000 declaration that he was a

17  witness to the murder, <u>see</u> Pet.'s Ex. 26, Tennison claims "that

18  there is a reasonable probability that, had Blue been interviewed

19  and subpoenaed, he would have offered evidence to exculpate

20  Tennison." Tennison also argues that Sanders' statements that the

21  chase started at the 7-11 suggested evidence that could have been

22  used to impeach Masina and Pauline. Tennison also claims that the

23  prosecution furnished Adachi with misleading information about Blue

24  because the prosecution gave him a copy only of the second

25  _____

26  [14]Sanders said "the 7-11 on Third Street," which is where,
according to Smith, she, Blue, Ricard and Mark Anthony first met

27  the cars and pick-up truck from Lakeview. According to Smith, the
car chase began at the Bayshore 7-11.

28  96

United States District Court
For the Northern District of California

interview with Blue, the short interview in which Blue merely indicated he had nothing to say about the murder. Hendrix and Sanders listed only the second interview of Blue in their investigation log, which was turned over to Adachi. <u>See</u> Pet.'s Ex. 20. Tennison argues that by giving Adachi the tape of the second interview and not listing the first interview on the investigation log, the prosecution conveyed the false message that Blue was a dead end as a witness. Further, according to Tennison, it also covered up the fact that police had other witnesses and another theory of the case.

Respondent counters that even if Adachi had a copy of the first Blue interview, it would not have helped the defense because when Adachi approached Blue after the trial at the request of Tennison, Blue denied any involvement. Respondent argues that Blue's 2000 declaration that he was a witness does not change the fact that, in 1990, he was steadfastly denying that he had been at the scene of the murder. Respondent claims that even if the police had information and believed that the chase started at the 7-11, the Blue interview is not material because the police could have believed that the chase started at the 7-11 and passed by Lovers' Lane and then down Visitacion as described by Masina and Pauline. Thus, Respondent concludes that nothing in the first interview of Blue discredited the testimony of Pauline and Masina. Finally, Respondent argues the fact that Blue was given his <u>Miranda</u> rights in his interview had put Adachi on notice that the police suspected that Blue was not being truthful.

Nonetheless, the videotape of the interview would have

informed Adachi that the police had credible information that the
car chase did not occur as portrayed by Masina and Pauline, which
could have led to further information enabling Adachi to impeach
them at trial.   Respondent's new theory that the chase could have
started at the 7-11, and then gone by Lovers' Lane and back down
Visitacion contradicts Masina and Pauline's testimony that the
pick-up and three cars were parked behind them at Lovers' Lane for
some time before the chase started.

Pursuant to <u>Brady</u> and <u>Giglio</u>, the prosecution should have
disclosed to the defense the first Blue interview.

E. Ricard's November 7, 1990 Confession

Tennison argues that Ricard's statement confessing to
Shannon's murder and corroborating that Tennison and Goff were not
at the scene of the murder was strong evidence of Tennison's
innocence and the fact that the prosecution turned it over to Grim
only on the last day of testimony on the hearing on the motion for
new trial is a <u>Brady</u> violation.   One of the reasons given by the
judge for not admitting Ricard's confession at the motion for new
trial was that there had been no showing of Ricard's unavailability
as a witness.   Tennison argues that had the prosecution turned over
the confession as soon as it was made, some six months earlier,
Adachi would have had time to subpoena Ricard to the hearing or to
establish his unavailability.[15]

---

[15]Tennison also argues that if the confession had been turned
over to Adachi when he was still Tennison's attorney in November,
1990, Adachi would have known that Tennison's legal interests were
adverse to Ricard's and the public defender's office would not have
been appointed to represent Ricard on another charge.   According to
Tennison, because the confession was not disclosed, the public

98

Respondent concedes that the confession "should have been provided to Tennison's counsel seasonably after it was made," but argues that Tennison cannot establish that he was prejudiced as a result of the delay.  Respondent claims that even without disclosure of the confession, Tennison knew that Ricard was involved with Shannon's shooting.  To support this theory, Respondent cites the testimony of Tennison and Adachi at the motion for new trial that Tennison had told Adachi that Ricard was claiming to have been involved in the murder and that Adachi was searching for Ricard.  Further, Respondent points out that Adachi had found Ricard and made his own tape of Ricard's confession. Respondent also argues that the trial court found both of Ricard's taped confessions to be untrustworthy, and the appellate court affirmed.

Due process requires the disclosure of exculpatory material in sufficient time to permit the defendant to make effective use of the material.  <u>LaMere v. Risley</u>, 827 F.2d 622, 625 (9th Cir. 1987).

defender agreed to represent Ricard, thus creating a conflict with Tennison which was resolved by Adachi's withdrawal as Tennison's counsel.  This may well be true.  Tennison argues that he was prejudiced by the appointment of new counsel because Grim's representation was ineffective as demonstrated by his failure to ensure that the confession was admissible by establishing Ricard's unavailability.  Because the Court does not address Tennison's claim of Grim's ineffective assistance, the Court does not address Tennison's argument here that the late disclosure of Ricard's confession was prejudicial because it was one of the factors that caused Adachi to withdraw as Tennison's defense counsel and Grim to be appointed as Adachi's replacement.  The Court notes, however, that had Adachi timely received Ricard's confession in November, the entire proceeding on the motion for new trial would have been different because Adachi would have premised his motion on Ricard's November confession to the police, not on Ricard's later confession to Adachi in which he appeared with a hood over his face.

99

In determining whether the timeliness of the disclosure satisfied due process, a court considers the prosecution's reasons for late disclosure and whether the defendant had an opportunity to make use of the disclosed material. Id. (citing United States v. Davenport, 753 F.2d 1460, 1462 (9th Cir. 1985) and United States v. Alderdyce, 787 F.2d 1365, 1369-70 (9th Cir. 1986) (no due process violation where evidence turned over to defendant before trial and as soon as prosecution learned of it)).

Respondent fails to provide a reason for turning over the Ricard confession six months after it was obtained by the police. Under Alderdyce, the prosecution's egregiously long withholding of vital evidence without reason or excuse rises to the level of a due process violation.

Moreover, Respondent's arguments that there was no prejudice as a result of the late disclosure are unpersuasive. The primary focus of the motion for new trial was the unauthenticated and therefore inadmissible videotape of a hooded, unidentified person confessing to the shooting.

It must be kept in mind that at the time of the new trial motion, the prosecution still had not disclosed the Brady evidence of Smith's statements to the police and Sanders' reliance on her information in the Blue interview. Ricard's statement would have been corroborated by Smith's statement and Sanders' reliance on it, making it apparent that important testimony had been excluded from the trial. In ruling on the motion for new trial, the judge found Ricard's testimony inconsistent and uncorroborated, but Pauline and Masina's testimony was inconsistent too, and the judge did not know

100

that Ricard's testimony in fact was corroborated. As events
actually unfolded at the motion for new trial, the trial court and
the appellate court compared Ricard's statement that the car chase
started at the 7-11 with Pauline and Masina's trial testimony that
the car chase started at Lovers' Lane. Without the withheld Brady
evidence, the trial testimony was uncontroverted, and Ricard's
statement that the chase started at 7-11 was suspect. The evidence
from Smith, which Sanders found reliable, that the car chase
started at the 7-11 and not at Lovers' Lane would have changed the
calculus. Smith and Ricard's version was more consistent with the
physical evidence and neighbor testimony. Furthermore, had Blue
and Anthony known that Ricard had already confessed to the police,
they may have come forward earlier. Had all of the Brady evidence
been available in time for Tennison to make use of it, the outcome
of the new trial motion would probably have been different.

In its opposition to Tennison's motion for new trial, the
prosecution argued, inter alia, that the events as described by
Ricard in his confession were "completely incapable of being
corroborated." See Pet.'s Ex. 47 at 19. One of the reasons
proffered by the prosecution for its inability to corroborate the
confession was Ricard's refusal to identify any other people who
were witnesses to Shannon's shooting, even those individuals Ricard
stated were uninvolved with any wrongdoing. Id. At that time, the
prosecution knew or should have known that Smith had made a
statement indicating that Ricard was involved with the shooting and
that the car chase started at the 7-11, thus partially
corroborating the events as described by Ricard. Therefore, the

101

1   prosecution's statement that the events described by Ricard were

2   "completely incapable of being corroborated," was incorrect. The

3   fact that the prosecution misled the court while delaying the

4   disclosure of Ricard's confession and continuing to suppress the

5   Smith and Blue interviews further supports the Court's conclusion

6   that a <u>Brady</u> violation occurred.

7   IV. Cumulative Effect of Suppressed Evidence

8        The materiality of suppressed evidence is to be considered

9   collectively, not item by item. <u>Kyles</u>, 514 U.S. at 436. Given the

10  weakness of the prosecution's case against Tennison, the Court

11  finds that there is a reasonable probability that any one of the

12  five items of withheld <u>Brady</u> evidence discussed above could have

13  caused the result of Tennison's new trial motion and of his trial

14  to have been different. It follows that had the prosecution timely

15  turned over to Adachi all the withheld evidence, there is a

16  stronger reasonable probability of a different result. The Court's

17  confidence in the outcome of this trial is undermined.

18                          CONCLUSION

19       Because the Court's confidence in the outcome of the

20  Tennison's trial has been undermined by the <u>Brady</u> violations, the

21  Court need not reach Tennison's claims of actual innocence,

22  ineffective assistance of Grim, and due process violations based on

23  failure of the police to investigate and the prosecution's reliance

24  on perjured testimony. For the reasons set forth above, Tennison's

25  petition for writ of habeas corpus is granted and his motion for an

26  evidentiary hearing is denied as moot. Tennison's conviction is

27  VACATED and Respondent is ordered to release Tennison from custody

28                             102

1  within sixty (60) days of the date of this order unless the State

2  of California reinstitutes criminal proceedings against him.

3

4  IT IS SO ORDERED.

5  Dated:      AUG 2 6 2003

6                                          CLAUDIA WILKEN
                                           United States District Judge

7

8  Copies mailed to counsel
9  as noted on the following page

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
for the
Northern District of California
August 26, 2003

scc

* * CERTIFICATE OF SERVICE * *


Case Number:4:98-cv-03842

Tennison

   vs

Henry

_____

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on  August 26, 2003, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

> Glenn Pruden, Esq.
> CA State Attorney General's Office
> 455 Golden Gate Ave
> Suite 11000
> San Francisco, CA  94102-7004
>
> Elliot R. Peters, Esq.
> Keker & Van Nest LLP
> 710 Sansome St
> San Francisco, CA  94111-1704


Richard W. Wieking, Clerk

BY: _____
     Deputy Clerk